**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| THE UNIVERSITY OF TEXAS MD ANDERSON CANCER CENTER, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | Civil Action No. _____ |
| ROBERT F. KENNEDY, JR., IN HIS CAPACITY AS SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, | § § § § § § | |
| *Defendant.* | § § § | |

## COMPLAINT FOR JUDICIAL REVIEW OF AGENCY ACTION UNDER THE MEDICARE ACT

## NATURE OF SUIT

1.    This is an action by The University of Texas MD Anderson Cancer Center ("MD Anderson") for judicial review of a final decision by defendant, Robert F. Kennedy, Jr., in his capacity as Secretary of the United States Department of Health and Human Services ("Secretary") and through the Secretary's Provider Reimbursement Review Board ("PRRB" or "Board"), that failed to reimburse MD Anderson in accordance with the Medicare statute for the graduate medical education training costs it incurred for the years 2013 through 2018. MD Anderson is recognized internationally as one of the world's leading cancer hospitals and trains physicians in a wide range of oncology specialties with a focus on increased understanding and awareness, improved treatments, and cures for cancer.

2.    Since the inception of the Medicare Program in 1965, Congress recognized the importance of the nation's teaching hospitals and developed a statutory payment methodology designed to reimburse such hospitals for Medicare's portion of the costs associated with graduate

medical education, or "GME" or "DGME" as the term is frequently referenced in the program. The Secretary has implemented regulations over time to execute Congress' Medicare payment directives, including a calculation methodology for determining the number of physicians training in their initial post-graduate medical residency programs ("Residents") and those training in post-residency specialty training programs ("Fellows").

3.    In 2020, the Secretary directed his Medicare Administrative Contractors to reopen Medicare cost reports to make corrective adjustments to GME payments to account for statutory payment requirements for nursing and allied health education relating to the Medicare Advantage program.  Consequently, in March of 2021, MD Anderson's contractor reopened MD Anderson's cost reports for its fiscal years 2013-2018 to (i) "recalculate" its GME payments in accordance with the Secretary's instructions, (ii) incorporate other settlements to "ensure proper determination of payments," and (iii) "address cost report mathematical and flow errors."

4.    In May of 2021, the U.S. District Court for the District of Columbia found that the Secretary's GME regulation at 42 C.F.R. § 413.79(c)(2)(iii) failed to follow the statutory payment instructions in 42 U.S.C. § 1395ww(h), which had resulted in years of systematic underpayments for academic medical centers, particularly those, like MD Anderson, who have large specialty training programs for Fellows.  *Milton S. Hershey Med. Ctr. v. Xavier Becerra*, 2021 WL 1966572 (D.D.C. May 17, 2021).  Once the statutory error was revealed by the *Hershey* decision, the Secretary conceded the error and amended the regulation to conform to the statutory calculation methodology.  *See* 87 Fed. Reg. 48780, 49066 (Aug. 10, 2022).

5.    Despite MD Anderson notifying its Medicare contractor of the holding in *Hershey* and MD Anderson's expectation that its GME calculations would be made in accordance with the statutory calculation methodology for the cost reports that the Medicare contractor reopened, the

2

Secretary's contractor failed to correct the past statutorily-flawed GME calculation methodology that had systematically understated MD Anderson's GME reimbursement amounts during the reopened periods. As a result, the Medicare Program retained approximately $13.9 million in statutorily directed reimbursement for Medicare's portion of the costs associated with MD Anderson's GME training activities for those years.

6. Following the Secretary's administrative process, MD Anderson appealed to the PRRB. MD Anderson cited the failure of the Secretary's payment contractor to perform the correction of MD Anderson's GME calculation during its reopening, which reopening was specifically made by the contractor to address MD Anderson's GME payments and the correction of past "cost report mathematical and flow through errors."

7. However, the Secretary's PRRB refused to grant jurisdiction to hear MD Anderson's administrative appeal and dismissed its challenge. *See* Exhibit 1. The PRRB asserts that the Secretary's reopening regulation at 42 C.F.R. § 405.1885 permitted the Medicare contractor to reopen and perform a recalculation of MD Anderson's GME payment but without making any corrections to the faulty formula lying at the core of the original GME calculation and without following the statutorily correct methodology for calculation of GME costs and payments to MD Anderson. *Id.*

8. In sum, having publicly acknowledged the inherent flaw in the regulatory GME calculation methodology that underpaid MD Anderson for Medicare's portion of its GME costs since 1997, the Secretary now intends to sidestep any responsibility for correcting such underpayments, even where the Secretary had reopened MD Anderson's cost reports to fix GME-related items that inure to the Secretary's benefit. Such arbitrary application of the law cannot withstand even modest judicial scrutiny.

9.      MD Anderson seeks an order requiring the Secretary to follow the law.  The Secretary's attempt to avoid paying $13.9 million in undisputed GME payments for the fiscal periods 2013-2018 is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and otherwise contrary to law.  *See* 5 U.S.C. § 706.  The Secretary selectively reopened MD Anderson's cost reports for those fiscal periods and specifically targeted GME as a matter to be addressed by the reopening.  The Secretary cannot now turn a blind eye to the statutory requirements for calculating GME payments during those reopened years.  Thus, MD Anderson turns to this Court in order to compel the Secretary to follow the plain dictates of Congress (and the Secretary's own recognition of his flawed GME calculation regulation) to ensure that MD Anderson's GME is paid correctly.

**PARTIES**

10.      The plaintiff, The University of Texas MD Anderson Cancer Center, is a provider of cancer care, education, and research, and is a member of The University of Texas System, an agency of the State of Texas.  *See* Tex. Gov't Code §§ 441.101(3), 572.002(10)(B), 556.001(2)(B).  MD Anderson is located in Houston, Texas and was one of the first three federally-recognized comprehensive cancer centers designated by the National Cancer Institute, pursuant to the National Cancer Act of 1971, to lead the fight against cancer.  *See* National Cancer Act of 1971, Pub. L. No. 92-218, § 3, 85 Stat. 778, 779 (1971).  MD Anderson participates in the Medicare program under Medicare provider number 45-0076.  MD Anderson is one of the comprehensive cancer centers described in 42 U.S.C. § 1395ww(d)(1)(B)(v), and it furnishes inpatient and outpatient hospital services to patients entitled to benefits under the Medicare program.

11.      Robert F. Kennedy, Jr. is the Secretary of the United States Department of Health and Human Services, the federal agency that administers the Medicare program.  The Secretary is

sued in his official capacity.  References to the Secretary are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

12.    The Centers for Medicare & Medicaid Services is a component of the Secretary's agency with responsibility for day-to-day operation and administration of the Medicare program.

## JURISDICTION AND VENUE

13.    The action arises under the Medicare Act, title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* In addition, this Court authority to hear this action pursuant to its mandamus jurisdiction for actions against a federal agency or official under 28 U.S.C. § 1361.  Together, these statutes establish that a federal district court has subject-matter jurisdiction to review and, where appropriate, compel agency action.

14.    Jurisdiction is proper under 42 U.S.C. § 1395oo(f)(1), 28 U.S.C. §§ 1331, and 28 U.S.C. § 1361.

15.    Venue is proper in this judicial district pursuant under 42 U.S.C. § 1395oo(f)(1) and 28 U.S.C. § 1391(e)(1).

## STATUTORY AND REGULATORY BACKGROUND

*Medicare Program Background*

16.    The Federal Medicare program provides health insurance to the aged, blind, and disabled under title XVIII of the Social Security Act.  42 U.S.C. §§ 1395 *et seq.*  The Secretary has delegated much of the responsibility for administering the Medicare program to CMS, which is a component of the Department of Health and Human Services.

17.     Under the Medicare statute, an eligible Medicare beneficiary is entitled to have payment made by Medicare on his or her behalf for, *inter alia*, inpatient and outpatient hospital services provided by a hospital participating in the Medicare program as a provider of health care

services.  *Id.*  The Medicare program consists of four Parts: A, B, C, and D.  Inpatient hospital services are paid under Part A of the Medicare statute.  *Id.* § 1395d(a).  Physician, hospital outpatient, and certain other services are paid under Medicare Part B.  *Id.* § 1395k(a).  Medicare Part C is an optional managed care program that pays for services that would otherwise be covered under Medicare Parts A and B.  *Id.* §§ 1395w-21 to 1395w-29.  Medicare Part D is an optional insurance program for prescription drugs.  *Id.* §§ 1395w-101 to 1395w-154.  This action concerns reimbursement under Medicare Part A.

***Medicare Funding for Graduate Medical Education Training Costs***

18.    Since the beginning of the Medicare program, Congress has recognized that training physicians enhances the quality of patient care in hospitals, and the cost of this training should "be borne to an appropriate extent by the hospital insurance program."  S. Rep. No. 404, 89th Cong., 1st Sess. at 36 (1965).  From 1965 until 1985, Medicare reimbursed hospitals based on the "reasonable cost" of graduate medical education.  *See* 42 U.S.C. § 1395f(b)(1); *see also* 42 C.F.R. § 413.85 (1982).  Congress then moved to a prospective payment system for reimbursing GME costs, effective for hospital cost reporting periods beginning on or after July 1, 1985.  Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99–272, § 9202, 100 Stat. 82 (codified at 42 U.S.C. § 1395ww(h)).

19.    The Medicare GME payment to hospitals is calculated by multiplying a hospital's "patient load" times its "approved amount."  *Id.* § 1395ww(h)(3)(A).  The "patient load" is "the fraction of the total number of inpatient-bed-days . . . during the period which are attributable to patients with respect to whom payment may be made under [Medicare] part A."  *Id.* § 1395ww(h)(3)(C).  The statute was amended to further require that the apportionment to the Medicare "patient load" included patients under Medicare's Part C managed care program (known

now as Medicare Advantage).  *Id.* § 1395ww(h)(3)(D).  The "approved amount" is the product of a hospital's base-period per-resident amount ("PRA") and its weighted average number of full-time equivalent ("FTE") residents.  *Id.* § 1395ww(h)(3)(B); 42 C.F.R. § 413.76(a).  The weighted average number of FTEs is calculated using the average of "the actual full-time equivalent resident counts for the cost reporting period and the preceding two cost reporting periods." 42 U.S.C. § 1395ww(h)(4)(G).  The following is the basic formula for calculating a hospital's GME payment:

*PRA x (3-year FTE average) x (Medicare Patient Load) = GME Payment*

20.    Pursuant to the statute, residents are "weighted" by virtue of their status in their training.  A resident's "initial residency period" ("IRP") is defined as the period necessary for board eligibility in the resident's training program, not to exceed five years. *Id.* § 1395ww(h)(5)(F).  Most, though not all, residents who are beyond the IRP are participating in post-residency fellowship programs.  When determining the FTE count, residents who are beyond their IRP are weighted at 0.5, so that only half their eligible time is counted. *Id.* § 1395ww(h)(4)(C).  Residents who are within their IRPs are weighted at 1.0, so all their eligible time is counted.  *Id.*  The statute permits only two weights: 1.0 and 0.5.

21.    For cost reporting periods beginning on or after October 1, 1997, Congress established a cap on the number of FTEs that a hospital may count for GME purposes, which is set at each hospital's number of *unweighted* FTEs during its most recent fiscal year that ended on or before December 31, 1996.  *Id.* § 1395ww(h)(4)(F).  Thus, a hospital's three-year FTE average in the GME formula is limited by the number of unweighted FTEs that the hospital trained in its 1996 cost reporting period.  The FTE cap is determined "before application of weighting factors" described in the previous paragraph.  *Id.* § 1395ww(h)(4)(F)(i).

7

*The Secretary's "Weighted FTE Cap" Calculation*

22.     In 1997, the Secretary promulgated a regulation to implement the 1996 cap that calculates a *weighted* FTE cap to be used in the payment calculation:

> If the hospital's number of FTE residents in a cost reporting period beginning on or after October 1, 1997, exceeds the limit described in this paragraph (g) [i.e., the 1996 unweighted cap], the hospital's weighted FTE count (before application of the limit) will be reduced in the same proportion that the number of FTE residents for that cost reporting period exceeds the number of FTE residents for the most recent cost reporting period ending on or before December 31, 1996.

42 C.F.R. § 413.86(g)(4) (1997).

23.     On August 1, 2001, the Secretary amended the regulation to determine separate weighted FTE caps for primary care residents and non-primary care residents, effective for cost reporting periods beginning on or after October 1, 2001.  42 C.F.R. § 413.86(g)(4)(iii) (2001); Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Rates and Costs of Graduate Medical Education: Fiscal Year 2002 Rates, 66 Fed. Reg. 39828, 39893-96 (Aug. 1, 2001) (hereinafter "FY 2002 IPPS Rule").  The Secretary did not change the formula for determining the weighted FTE cap.  Rather, the Secretary used the same methodology as in the 1997 rule to calculate a primary care weighted FTE cap and a non-primary care weighted FTE cap, which were then added together.  42 C.F.R. § 413.86(g)(4)(iii) (2001); FY 2002 IPPS Rule, 66 Fed. Reg. at 39894.

24.     In 2004, the Secretary redesignated the regulation from 42 C.F.R. § 413.86(g)(4)(iii) to 42 C.F.R. § 413.79(c)(2)(iii).  Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates, 46 Fed. Reg. 48916, 49112, 49258-64 (Aug. 11, 2004).

25.     The Secretary's regulation resulted in the calculation of a hospital's FTE count that was inconsistent with the statute.  In sum, the regulation misapplied weighting factors and caps

8

which reduced the final weighted FTE count for hospitals. The Secretary's calculation methodology can be expressed using the following equation:

$$\textit{(1996 FTE Cap)/(Unweighted FTEx) x Weighted FTEs = Weighted FTE}$$

The Secretary described the result of the formula as the "hospital's reduced cap." *See* FY 2002 IPPS Rule, 66 Fed. Reg. at 39894.

26. For hospitals whose residency training programs focused on advanced specialty fellowship programs, like MD Anderson, the weighted FTE count implemented by the regulation penalized them by limiting their Medicare reimbursement for training physicians to an FTE cap lower than that directed by the statute. The regulation calculated a hospital's GME payment based on weighted FTE caps, which effectively resulted in the hospital never being able to exceed its unweighted cap. 42 C.F.R. §§ 413.76(a), 413.79(c)(2)(iii).

***The Hershey Decision and Secretary's Correction to the GME Calculation***

27. In *Milton S. Hershey Medical Center v. Becerra*, numerous hospitals challenged the Secretary's GME methodology regulation under 42 C.F.R. § 413.79(c)(2)(iii). *Hershey,* 2021 WL 1966572 (D.D.C. May 17, 2021). The U.S. District Court for the District of Columbia held "that [the Secretary's] application of the regulation to compute Plaintiffs' full-time equivalent residents was contrary to law because the regulation effectively changed the weighting factors statutorily assigned to residents and fellows." *Hershey Med. Ctr.*, 2021 WL 1966572, at *1. The *Hershey* Court explained as follows:

> Simply put, the text of the statute does not give the Secretary the latitude to decide, under these conditions, to change the weights that Congress assigned to residents and fellows when he calculates the FTE residents for each hospital. Rather, the statute is clear: the Secretary's rules "shall provide, in calculating the number of [FTE] residents in an approved residency program," that residents be weighted at 1.0 and fellows at 0.5. § 1395ww(h)(4)(C). When Congress uses the word "shall," its language is mandatory or imperative, not merely precatory." *See United States v. Monzel*, 641 F.3d 528, 531 (D.C. Cir. 2011). Thus, the Court's inquiry ends at

9

*Chevron* step one, and it holds that the regulation is unlawful as applied to [the plaintiff hospitals].

*Id.* at *5.

28.    On August 10, 2022, the Secretary published the FY 2023 Final Rule, which formally changed the method for calculating GME payments following the D.C. District Court's ruling in *Hershey* and adopted a new regulation to replace the flawed mathematical formula. FY 2023 Final Rule, 87 Fed. Reg. 48780, 49066–72 (Aug. 10, 2022).  The Secretary conceded that the then "existing formula for computing the number of FTEs was inconsistent with the statutory requirements," and finalized a rule that applies a new formula for calculating FTEs consistent with the *Hershey* decision and statute.  *Id.* at 49066–72.

29.    The Secretary stated, "[a]fter reviewing the statutory language regarding the direct [graduate medical education] [full-time equivalent] cap and the court's opinion [in *Hershey Medical Center*]," the agency decided to "implement a modified policy to be applied prospectively for all teaching hospitals, as well as retroactively to the providers and cost years in *Hershey* and certain other providers."  *Id.* at 48784.

30.    CMS designed this retroactive rule to address situations where a hospital's unweighted number of FTE residents exceeds the FTE cap, and the number of weighted FTE residents also exceeds that cap.  In such cases, the weighted FTE counts would be adjusted to ensure the total weighted FTE count equals the FTE cap.  And if the number of weighted FTE residents does not exceed the FTE cap, the weighted FTE count would be used for calculating the GME payment.  The Agency's regulation now states:

> Effective for cost reporting periods beginning on or after October 1, 2001, if the hospital's unweighted number of FTE residents exceeds the limit described in this section, and the number of weighted FTE residents in accordance with paragraph (b) of this section also exceeds that limit, the respective primary care and obstetrics and gynecology weighted FTE counts and other weighted FTE counts are adjusted

10

to make the total weighted FTE count equal the limit.  If the number of FTE residents weighted in accordance with paragraph (b) of this section does not exceed that limit, then the allowable weighted FTE count is the actual weighted FTE count.

42 C.F.R. § 413.79(c)(2)(iii) (2025).

31.     In his rulemaking, the Secretary found "good cause" to promulgate the new rule retroactively to cost reporting periods starting on or after October 1, 2001.   42 C.F.R. § 413.79(c)(2)(iii) (2022).  The Secretary explained as follows:

> [T]he statute at issue states that "[t]he Secretary shall establish rules *consistent with this paragraph* for the computation of the number of full-time equivalent residents in an approved medical residency training program."  Section 1886(h)(4)(A) of the Act (emphasis added).  And the *Hershey* court did say that the rules at issue were not consistent with the statute.  Following our review of the *Hershey* court's reasoning and the statutory requirements, we decided that our method for computing FTEs was not consistent with statutory requirements.  We therefore conclude that our existing rule, which does not comply with the statute, should be modified retroactively such that our FTE computation rules are consistent with the statute and payments, including payments for open cost years in past, are calculated pursuant to regulation.

FY 2023 Final Rule, 87 Fed. Reg. at 49069.

32.     Several commenters urged the Secretary to reopen closed cost reports to apply the new, lawful rule.  These commenters stated that 42 C.F.R. § 405.1885(c) should not prevent reopening to correct the improper payments.  Despite conceding that past GME payments were unlawfully calculated and that recalculating past payments is in the public interest, the Secretary refused to reopen closed cost reports and apply the new regulation to GME payments that the Secretary admits were unlawfully determined:

> We disagree that 405.1885(c)(2) does not apply to retroactive rules.  The text of the regulation does not support that proposed carve-out.  The rule we proposed—and finalize here—is a "change of legal interpretation or policy by CMS in a regulation . . . made in response to judicial precedent," and thus it is "not a basis for reopening a CMS or contractor determination."  Some commenters urged us to apply 42 CFR 405.1885(c)(1) to direct contractors to reopen cost reports, but we note that paragraph (c)(1) allows CMS to do so ("CMS may direct a contractor . . . to reopen and revise") subject to the prohibited reopenings in paragraph (c)(2).  We disagree

11

that this rule will have no "real retroactive effect," as a number of hospitals will receive increased reimbursement for past cost reporting years.

FY 2023 Final Rule, 87 Fed. Reg. at 49070.

33.     The Secretary asserted, "Consistent with § 405.1885(c)(2), any final rule retroactively adopting the proposed new policy would not be the basis for reopening final settled NPRs." *Id.* at 49067.  However, the Secretary did *not* address the application of his policy to hospitals whose cost reports had been reopened by CMS to address the GME calculation and mathematical and flow through errors.  And neither would he need to, because cost reports that are reopened by the Medicare contractor to address GME are "open" (by the plain meaning of the term "reopen").

***The Medicare Cost Reporting and Appeal Process***

34.     At the close of a hospital's fiscal year, it is required to submit to its designated Medicare Administrative Contractor (often referred to in the Medicare Program as a "MAC") a "cost report" showing both the costs incurred by the hospital during the fiscal year and the appropriate share of these costs to be apportioned to Medicare.  42 C.F.R. § 413.24(f).  MACs are private companies under contract with the Secretary to pay Medicare claims and audit hospital cost reports, among other duties.  42 U.S.C. § 1395kk-1.

35.     The MAC must analyze and audit the cost report and inform the hospital of a final determination of the amount of Medicare reimbursement through a Notice of Program Reimbursement ("NPR").  42 C.F.R. § 405.1803(a).  A hospital's GME payment is among the components of the final payment determination reported in the NPR, with a specific worksheet designated for the various calculations.

36.     A hospital may appeal a final determination of its Medicare cost report reimbursement to the Board.  42 U.S.C. § 1395oo(a).  The Board has jurisdiction over appeals from

MAC determinations if the following requirements are met: (1) the hospital is dissatisfied with the final determination; (2) the amount in controversy is at least $10,000; and (3) the hospital requests a hearing within 180 days of receiving the final determination. *Id*.

37.    In addition, a hospital has the right to a Board hearing for matters subject to a cost report reopening.  This right to appeal a determination based on a reopening is set forth in CMS's regulations at 42 C.F.R. § 405.1889 and permits a hospital to appeal revisions to its cost report, with the regulatory proviso that "only those matters that are specifically revised in a revised determination or decision are within the scope of any appeal of the revised determination or decision."  42 C.F.R. § 405.1889(b)(1).

38.    A Board decision is final and binding on the parties unless it is reversed by the CMS Administrator or a federal court.  *Id.* §§ 405.1875(a), 405.1877(a).

***The Medicare Cost Report Reopening Process***

39.    Congress permits the Secretary to reopen and revise Medicare claims "under guidelines established by the Secretary in regulations."  42 U.S.C. § 1395ff(b)(1)(G).

40.    Before 2002, a Medicare regulation <u>*required*</u> MACs to reopen and revise cost reports under the following circumstances:

> A determination or a hearing decision rendered by the intermediary *shall be reopened and revised* by the intermediary *if*, within the aforementioned 3-year period, the *Centers for Medicare & Medicaid Services notifies the intermediary* that such determination or decision is *inconsistent with the applicable law, regulations, or general instructions* issued by the Centers for Medicare & Medicaid Services in accordance with the Secretary's agreement with the intermediary.

42 C.F.R. § 405.1885(b) (2001) (emphasis added).

41.    In 2001, the D.C. Circuit Court of Appeals held that former 42 C.F.R. § 405.1885(b) required the Secretary to reopen cost reports to correct certain prior payment determinations that the Secretary conceded were erroneous.  *Monmouth Med. Ctr. v. Thompson,*

257 F.3d 807, 813 (D.C. Cir. 2001). In 1997, the Secretary issued Ruling 97-2, without notice and comment, revising a Medicare policy for disproportionate share hospitals ("DSHs") that was invalidated by four Circuit Courts of Appeal. *See Monmouth*, 257 F.3d at 810 (citing *Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984 (4th Cir. 1996); *Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261 (9th Cir. 1996); *Deaconess Health Servs. Corp. v. Shalala*, 83 F.3d 1041 (8th Cir. 1996); *Jewish Hosp., Inc. v. Sec'y of Health & Hum. Servs.*, 19 F.3d 270 (6th Cir. 1994)). The Secretary stated, "Although [CMS] believes that its longstanding interpretation of the statutory language was a permissible reading of the statutory language, [CMS] recognizes that, as a result of the adverse court rulings, this interpretation is contrary to the applicable law in four judicial circuits." CMS, *HCFA Ruling 97-2* (Feb. 1997), https://www.cms.gov/Regulations-and-Guidance/Guidance/Rulings/CMS-Rulings-Items/CMS026540. However, the revised CMS policy would be implemented "on a prospective basis" only. *Id.* In Ruling 97-2, the Secretary purported to forbid reopening to correct the errors that were conceded: "We will not reopen settled cost reports based on this issue." *Id.*

42. Notwithstanding the Secretary's statement in Ruling 97-2 that he would not reopen cost reports to implement the revised policy, several hospitals requested reopening. *Monmouth*, 257 F.3d at 813. After the Secretary's fiscal intermediaries refused to reopen the plaintiff hospitals' cost reports, they sought a writ of mandamus compelling reopening. *Id.* Because the Secretary gave "notice of the [prior] interpretation's inconsistency with applicable law," the D.C. Circuit held that "§ 405.1885(b) imposed a clear duty on intermediaries to reopen DSH payment determinations for hospitals." *Id.* at 814. The D.C. Circuit held that the hospitals were entitled to reopening. *Id.* at 815.

14

43.    Following the *Monmouth* decision, the Secretary revised the cost report reopening regulation.  Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2003 Rates, 67 Fed. Reg. 49982, 50096-50100, 50110 (Aug. 1, 2002).  The Secretary expressed disagreement with *Monmouth* and changed the regulation to require an explicit directive to the MAC "to reopen in order to ensure consistency with a legal provision, as we understood such provisions with the determination was issued." *Id.* at 50097.

44.    The current reopening regulation at 42 C.F.R. § 405.1885(c) states as follows:

**(1) CMS-directed reopenings.**  CMS may direct a contractor or contractor hearing officer(s) to reopen and revise any matter, subject to the time limits specified in paragraph (b) of this section, and subject to the limitation expressed in paragraph (c)(2) of this section, by providing explicit direction to the contractor or contractor hearing officer(s) to reopen and revise.

**(i) Examples.**  A contractor determination or contractor hearing decision must be reopened and revised if CMS provides explicit notice to the contractor that the contractor determination or the contractor hearing decision is inconsistent with the applicable law, regulations, CMS ruling, or other interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS in effect, and as CMS understood those legal provisions, at the time the determination or decision was rendered by the contractor....

**(2) Prohibited reopenings.**  A change of legal interpretation or policy by CMS in a regulation, CMS ruling, or other interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS, whether made in response to judicial precedent or otherwise, is not a basis for reopening a CMS or contractor determination, a contractor hearing decision, a CMS reviewing official decision, a Board decision, or an Administrator decision, under this section.

42 C.F.R. § 405.1885(c)(1), (c)(2).

45.    The Secretary has relied on the changes to 42 C.F.R. § 405.1885(c) to avoid reopening cost reports (even within the three-year reopening window) to correct for agency errors in legal interpretations, which the Secretary contends has thereby reduced the agency's capacity to correct program underpayments.

46.     However, this reopening limitation does not apply to appeals to the PRRB. *See Saint Francis Med. Ctr. v. Azar*, 894 F.3d 290 (D.C. Cir. 2018).  In *Saint Francis*, the D.C. Circuit Court held that 42 C.F.R. § 405.1885(c) did not limit the PRRB's authority to review and correct certain predicate errors that were barred from the Medicare Administrative Contractor's review by the reopening rule.  In his concurrence, then Circuit Court Judge Brett Kavanaugh called for the regulation at 42 C.F.R. § 405.1885 to be vacated as an arbitrary and capricious exercise of agency power to avoid making accurate payments as directed by Congress.  *See Saint Francis*, 894 F.3d at 356 (Kavanaugh, B., concurring) ("Saving money is a laudable goal, but not one that may be pursued by using phony facts to shift costs onto the backs of hospitals.  The HHS regulation is arbitrary and capricious, and therefore should be vacated.").

### FACTS SPECIFIC TO THIS CASE

47.     MD Anderson is a teaching hospital that receives Medicare GME payments.  In addition to its GME training for physicians in their initial residency period for their medical specialty, MD Anderson as a specialized cancer center trains a significant number of physicians in advanced specialty fellowship programs in oncology.

48.     During all the years at issue in this case (2013-2018), MD Anderson trained Residents and Fellows with the following FTE counts reported on the Medicare cost report, which, when combined according to the Act, were in excess of the FTE cap established by Section 1886(h)(4)(H):

| Fiscal Year at Issue | Resident FTEs Trained | Fellow FTEs Trained | GME FTE Cap | GME FTE Reimbursed |
|---|---|---|---|---|
| FY 2013 | 110.78 | 172.44 | 157.31 | 109.42 |
| FY 2014 | 124.08 | 175.82 | 157.31 | 111.19 |
| FY 2015 | 107.14 | 187.08 | 157.31 | 107.29 |
| FY 2016 | 112.27 | 191.84 | 157.31 | 107.69 |
| FY 2017 | 139.09 | 182.88 | 157.31 | 112.63 |
| FY 2018 | 148.8 | 178.2 | 157.31 | 114.44 |

These FTE totals are not disputed and were finalized by the MAC in the original NPR received by MD Anderson for each fiscal year. For each of the years, MD Anderson's Medicare reimbursement represented payment for fewer GME FTEs than its GME FTE cap.

49. Because of the cancer-specialty nature of the Provider and its training programs, MD Anderson was significantly impacted by the "fellowship penalty" imposed by CMS through its *ultra vires* weighted FTE formula imbedded in the historical regulation at 42 C.F.R. § 413.79(c)(2)(iii). The *weighted* FTE formula combined with the large number of fellowship trainees acted to reduce MD Anderson's reimbursable FTEs significantly *below* the GME FTE cap, even though MD Anderson was training residents and fellows in substantial excess of the GME FTE cap.

50. In December 2020, the Secretary published an instruction notification to its payment contractors indicating that it was making certain updates to the nursing and allied health Medicare Advantage payment policies that would require adjustments to Medicare GME payments for certain hospitals. *See* CMS Change Request 11462, December 14, 2020. This instruction was made to conform with certain calculation requirements set forth in Section 541 of the Balanced Budget Refinement Act (BBRA) of 1999 (P. L. 106-113), and section 512 of the Benefits Improvement and Protection Act (BIPA), (P.L. 106-554). Medicare payment contractors issued reopening notices in accordance with this instruction and reopened cost reports, including MD Anderson's, to make certain adjustments to the cost report worksheet governing the calculation of a hospital's GME payments.

51. Specifically here, on March 16, 2021, Novitas Solutions, MD Anderson's MAC, notified MD Anderson that, at the direction of CMS, it was reopening MD Anderson's cost reports for the fiscal years 2013-2018 specifically to:

17

- To *__recalculate payments__* that are made to teaching hospitals for costs of direct GME associated with Medicare Advantage (MA) days in accordance with CR11642.

- To incorporate settlement (final, tentative, or HITECH) or lump sum amounts from the previous cost report settlement to *ensure proper determination of payments*, as necessary.

- To address cost report software updates and edits and *correct cost report mathematical and flow errors*, as necessary.

(emphasis added).

52.    During the period in which its 2013-2018 cost reports were reopened, and while its 2019 cost report was subject to its original audit, the D.C. District Court decision in *Hershey Medical Center* became final.  *See* ¶ 27, *supra*.  Based on the court's decision that the agency had imposed a flawed calculation formula for determining GME reimbursement, MD Anderson notified its MAC by letter of both the court's decision and MD Anderson's expectation that its GME reimbursement would be calculated in accordance with the governing Medicare statute. MD Anderson indicated specifically that "a correction to the CMS-approved formula for calculating its weighted FTE resident count is necessary to ensure that its Medicare GME reimbursement is accurate and appropriate under the Section 1886(h)."

53.    On February 28, 2022, MD Anderson's MAC issued revised notices of program reimbursement for each of MD Anderson's cost reports for the fiscal years 2013-2018 with adjustments identified to the cost reporting worksheet governing MD Anderson's GME reimbursement.  Among reporting other adjustments relating to MD Anderson's GME worksheet, the MAC indicated that it, "[c]orrected mathematical and flow through errors in cost reporting forms and pages as necessary."  However, despite MD Anderson's notification to the MAC, the MAC *failed to correct* MD Anderson's GME reimbursement consistent with the law and left the

18

imbedded predicate error associated with the past *statutorily-invalid* GME regulation in each of its recalculations for the FYs 2013-2018 cost reports that had been reopened.

54.     On May 10, 2022, the Secretary publicly acknowledged the longstanding legal reality of the *ultra vires* flaw in his payment regulation at 42 C.F.R. § 413.79 and proposed a new regulation to align with the statutorily mandated calculation. *See* 87 Fed. Reg. 28108, 28410-412 (May 10, 2022).

55.     Because the Secretary's MAC had reopened MD Anderson's 2013-2018 cost reports specifically to "recalculate" MD Anderson's GME reimbursement and to correct mathematical and flow through errors but failed to conduct its recalculations using a formula that reflected MD Anderson's statutory right to GME reimbursement at its FTE Cap level, MD Anderson appealed the MAC's revised NPR determination to the PRRB pursuant to its rights under 42 C.F.R. § 1889.  MD Anderson similarly appealed other errors that the MAC made during its reopening when recalculating elements of its GME payment according to CMS's directive in CR 11462.  The Board accepted jurisdiction of the other errors and they were resolved at the administrative level.

56.     However, the Secretary's Board rejected jurisdiction over the "GME Hershey Calculation Error Issue".  The Board claims that the MAC did not reopen the cost report to address the GME Hershey Calculation Issue and that MD Anderson was therefore considered on equal footing with hospitals for which no reopening had been conducted on their Medicare cost report. *See* Exhibit 1.  For such hospitals, the Board held that 42 C.F.R. § 405.1885(c)(2) prohibited the MAC from correcting their GME calculations despite their admittedly flawed results and despite the statutory requirements. *Id.*

19

57.     MD Anderson disputes the PRRB's jurisdictional determination and has timely sought judicial review by filing this Complaint.  The MAC did reopen MD Anderson cost reports for the purpose of correcting the GME payment calculation.  Once the cost reports were reopened to fix GME errors, CMS should have fixed all the errors (including the past *ultra vires* regulation error) and should have followed the law to pay MD Anderson correctly.

### ASSIGNMENT OF ERRORS

58.     Paragraphs 1-56 are hereby incorporated by reference.

59.     The Medicare statute provides for judicial review of the final determinations of the Secretary under the applicable provisions of the APA.  42 U.S.C. § 1395oo(f)(1).

60.     The applicable APA provisions require the reviewing court to "set aside" the Secretary's determination if it is in excess of statutory authority, an abuse of discretion, arbitrary, capricious, not based on substantial evidence, or otherwise contrary to law.  5 U.S.C. § 706(2). Under these bases, the Secretary's refusal to accept jurisdiction and make lawful corrections to MD Anderson's GME reimbursement for the fiscal years 2013-2018 must be rejected.

61.     The Secretary's decision to refuse jurisdiction in the appeal of its MAC's failure to apply corrections to MD Anderson's GME reimbursement when its cost reports were specifically reopened to "recalculate GME," "ensure proper determination of payments," and correct "cost report mathematical and flow through errors," is an arbitrary and capricious rejection of the plain language of the Secretary's reopening appeal regulation at 42 C.F.R. § 405.1889.

62.     The Secretary's refusal to instruct MD Anderson's payment contractor to make corrections to undisputed Medicare GME underpayments based on an *ultra vires* payment formula while the payment contractor had MD Anderson's cost report open to correct and adjust for more accurate GME accounting is patently arbitrary and capricious.  The Court must impose such instruction through its powers of review under 5 U.S.C. § 706(2).

63.    Alternatively, this Court must use its mandamus authority under 28 U.S.C. § 1361, which authorizes this Court to compel an officer of the United State or any agency thereof to perform a duty owed to the plaintiff.  The statute governing the calculation of the number of residents for GME reimbursement purposes is clear, and it is as equally clear that the Secretary *did not* follow that plain language when reopening MD Anderson's cost reports for 2013-2018 and performing calculations therein.  The payment obligation set forth in the statute must not simply be ignored by the Secretary to avoid making accurate payments.

64.    The Secretary's failure to apply its retroactive regulatory correction to MD Anderson's appeal of cost reports that were reopened by CMS to recalculate its Medicare GME reimbursement is unjustifiably unexplained and should be overturned as agency action that is unlawfully withheld or delayed, arbitrary, capricious, and otherwise contrary to law. *See* 5 U.S.C. § 706.

65.    The Secretary's regulation at 42 C.F.R. § 405.1885 is arbitrary and capricious to the extent is serves as a means for the Secretary to avoid statutory obligations of payments for cost reports that remain subject to reopening and review.  Indeed, the application of such regulation to MD Anderson's 2013-2018 cost reports that *were reopened* for GME recalculations and mathematical corrections highlights the Secretary's one-way restrictive use of the regulation to the detriment of accurate hospital reimbursement.

### RELIEF REQUESTED

66.    For the foregoing reasons, MD Anderson requests an Order and Judgment:

a)    declaring invalid and vacating the provisions of 42 C.F.R. § 405.1885 that the Secretary asserts prohibit him from making corrections to MD Anderson's Medicare GME payments under its 2013-2018 cost reports;

b)      directing the Secretary to instruct its payment contractor to make payment to MD Anderson for the underpaid Medicare GME costs for 2013-2018 as required by the statutory calculation requirements as described in *Hershey Medical Center* and affirmed by the Secretary himself;

c)      directing the Secretary's PRRB to accept jurisdiction over MD Anderson's 2013-2018 appeals of the additional amounts of GME due as a result of the payment contractor's failure to recalculate and correct the mathematical formula that originally understated MD Anderson's GME reimbursement for such cost reporting periods, plus interest calculated in accordance with 42 U.S.C. § 1395g(d) and 42 U.S.C. § 1395oo(f)(2);

d)      directing the Secretary to pay MD Anderson's legal fees and other costs of suit; and

e)      providing such other relief as the Court may deem appropriate.

Dated: April 14, 2026                    Respectfully submitted,

/s/ B. Scott McBride
B. Scott McBride
Texas Bar No. 24002554
Southern District No. 23628
scott.mcbride@morganlewis.com
John Petrelli
Texas Bar No. 24056125
Southern District No. 706315
john.petrelli@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street
Suite 4000
Houston, TX 77002-5005
Telephone: (713) 890-5744
Facsimile: (713) 890-5001

*Attorneys for The University of Texas*
*MD Anderson Cancer Center*